[No. 29479.   Department Two.   December 7, 1944.]

THE STATE OF WASHINGTON, *Respondent,* v. NORBERT
ROSSIGNOL, *Appellant.*[1]

*Harold M. Gleeson,* for appellant.

*Leslie M. Carroll* and *Clarence P. Smith,* for respondent.

ROBINSON, J.—This is an appeal by Norbert Rossignol from a judgment and sentence entered after his conviction by a jury upon the following information:

[1]Reported in 153 P. (2d) 882.

"Comes now the Prosecuting Attorney in and for Spokane County, Washington, and charges the defendants, John Doe and Norbert Rossignol, with the crime of Grand Larceny, committed as follows:

"That the said defendant, John Doe, whose true name is to the Prosecuting Attorney unknown, in the County of Spokane, State of Washington, on or about the 1st day of November, 1943, then and there being, did then and there willfully, unlawfully and feloniously take personal property, to-wit: the sum of Six Hundred and Eighty Dollars in lawful money of the United States, from the person of Alex Derreck, the owner thereof, with intent to deprive and defraud the said Alex Derreck of the said property; and that the said defendant, Norbert Rossignol, in the County of Spokane, State of Washington, on or about the 1st day of November, 1943, then and there being, did then and there willfully, unlawfully and feloniously aid, counsel and abet another, to-wit: the said John Doe, whose true name is to the Prosecuting Attorney unknown, in the taking of the said personal property, to-wit: the sum of Six Hundred and Eighty Dollars in lawful money of the United States, from the person of the said Alex Derreck, the owner thereof, with intent to deprive and defraud the said Alex Derreck of the said property."

Three questions are stated as being involved in the appeal, and there are five formal assignments of error. None of the assignments has to do with instructions given or refused or rulings as to the admission of evidence. All may be fairly disposed of by considering two questions: Was there sufficient evidence to sustain the verdict? and, Was there a prejudicial variance between the information and the evidence offered to sustain it?

The crime charged was alleged to have been committed in the Fountain Billiard Parlor, a combination beer parlor and card room conducted in a storeroom in Spokane. The room was about twenty feet in width, but of greater depth. As one entered from the street, there was a bar along the right wall, and a series of open booths along the left. Down the middle were some tables and chairs and a juke box. About forty feet from the entrance there was a transverse partition, of which the lower part was wood and the upper, glass. The back room thus created was used as a card

room. The construction of the partition was such that one sitting in a chair just back of it could see through the glass portion into the front room. At the time the crimes alleged to have been committed took place, there were thirty-five or forty people in the premises, of whom about twenty-five were in the front room.

The evidence will be abstracted in the order in which it was given. Newman, supervisor of the card room, testified that he was sitting on the left side, just back of the partition, and could see into the adjoining booth. He saw Rossignol seated in that booth. A little later he saw a man wrestling with Alex Derreck, an employee of the billiard parlor whom everyone called Nick, and saw the man take a purse or pocketbook from Nick's pocket. Rossignol was right there sitting in the booth. The man who had taken the purse and Rossignol hurried out together. Newman yelled to the proprietor: "There goes Nick's pocketbook."

Alex Derreck, or Nick as he was universally called, testified that there were two fellows in the booth, one of whom was Rossignol.

"A. Oh, they said, 'Nick, you sit down and drink, too.' I said, 'No. I am working here.' He speak my name. Q. What one spoke your name? A. And the other fellow pushed me, started wrestling with me. I said, 'Leave me alone. I am working here,' and about the same time he pulled my pocketbook, . . ."

He identified his pocketbook which still contained the $680 which was in it when taken from his pocket, and testified that it was returned to him shortly afterwards by a man named Erickson. On cross-examination, he testified that he did not know which of the men took the money, but made it clear that both were involved.

"A. Yes. There was two men. This fellow held me. This fellow called me 'Nick.' I said, 'Leave me alone. I am working here. I ain't got time.' He said, 'Oh, sit down; sit down.' The other fellow had his hand across my back, like that. I don't know which one took it, but one fellow got the money."

John Erickson testified that he was standing near the partition at the back of the front room when someone hol-

lered out that "two fellows in the booth got Nick's pocket-book," and that one of the fellows in the booth went towards the lunch counter, and the other "hit a fast gait to the front door, and when he got to the front door I took out after him." He identified Rossignol as that man, and testified that he ran down the block to Sprague and then turned south on Lincoln.

"Q. And were you ever able to catch up with him? A. I was just a few feet behind him. I was just behind him. I was going to catch up with him, and he just stopped and turned around and shoved the billfold at me, and then wheeled."

The witness further testified that he had just been discharged from an eleven-day treatment for bronchitis at a Spokane hospital, and that, at the moment Rossignol handed him the purse, he was overtaken by a violent spasm of coughing. When he was able to look up, Rossignol was nowhere in sight. He concluded that he must have run into an alley, since he would not have had sufficient time to reach the street corner. On cross-examination, he testified, in part, as follows:

"A. Another guy brought him back. Q. Who? A. I don't know the party's name. It is in the police records back there. Q. Where was he? A. He said he got him in the alley and came back with him. That is all I know."

Masselt, the proprietor of the billiard parlor, said that he saw Rossignol seated in the booth with a man whose name he had heard was Danny Wallace, or Eddy Wallace, and that he saw this man scuffling with Nick and seemingly trying to turn him around. Someone at the back called out: "They have got Nick's purse." Rossignol ran out, and later a tall, slight man, whose name witness did not know, brought him back. Masselt had already summoned the police.

Callerman, a police detective, testified that he responded to a call from the billiard parlor and took Rossignol to the police station. Erickson and a man named Day went with them. At the office Day said, in the presence of Rossignol:

"A. Well, he said, then—he said he saw this other man take the billfold off of this man, and this man went up the street, and he told us he caught him; he went on up the street and caught him and brought him back, and led him back to the Fountain Beer Parlor, and that is where we picked him up."

It was shown at this point that Day was somewhere in Seattle, and, after the cross-examination of Callerman, the state rested.

In order that we may have a complete picture of the matter, we also abstract the evidence of the defendant, although, since it is not within our province to weigh the evidence, his evidence is not strictly pertinent to our inquiry. Briefly, the defendant stated that he had been drinking whiskey during the day, and, being in a much befuddled condition, went into the beer parlor with the idea that a glass of beer would clear up his mind. He sat down in an unoccupied booth.

"Q. Did anyone join you afterward? A. Well, shortly afterwards. I had my beer, about to drink. I was sipping on it there and a party came over with this Nick, whatever they call him, the waiter down there, and he more or less had him by the arm and he had two glasses of wine in his hands, and he said—I don't remember; I think the other party said, 'May we sit down here?' and they sat down, and then they wanted to buy me a drink, and I said, 'No, I didn't care for more.' . . . Q. What was your condition at that time? A. Oh, I was more or less kind of in a fog. I don't know exactly how to explain it. I drank a lot of whiskey. That is the reason I wanted a beer, to kind of— Q. In any event, then following that what happened? A. Well, I was sitting there. I don't know as they came back. I don't believe the wine was even drank, and they went off up to the bar again, and I never paid any attention to them. I don't think they ever even sat down or drank their wine, and the first thing I know, there was a rumpus going on and a billfold came right past me. I was sitting there, and I don't know, I just casually walked out with it, and I don't know why. I gave the purse to a man inside or outside there. I wouldn't swear. I don't remember."

He further testified that he had no need of money at the time; that he did not know there was any money in the

purse; and vigorously denied that he ran down the street with it, but insisted that he handed it to someone right at the door. Continuing, he said:

"A. I went on up the street and I got to thinking it over and I got a block or so and I thought maybe some more trouble would come up, and I thought maybe I better go back and explain this thing. . . . Q. Did you go back to the place? A. I walked back and went in myself, absolutely."

On cross-examination, he testified, in part, as follows:

"Q. Did you hear these people in there call out, 'They got Nick's purse'? A. No, I never paid any attention. Q. You didn't hear that? Why did you decide to leave the place there so suddenly? A. Well, I don't know. I was just kind of more or less in a fog. I knew that I wasn't sober and I just wanted to get out of there."

Defendant rested his case upon his own testimony.

Detective Callerman, who arrested Rossignol at the Fountain very shortly after the incident, called in rebuttal, testified as follows:

"Q. I will ask you, Officer, what was the state of his condition with reference to intoxication? A. Well, you could smell something on his breath. He had been drinking, but he was absolutely sober. I would say he was sober. Q. And at the time that you went down there was there anyone there that was detaining him then? A. Yes. Mr. Day and Mr. Erickson both had hold of him. He was standing there in the doorway."

■ It is clear that the jury could reasonably find that a person designated in the information as "John Doe," whose name may have been Danny Wallace or Eddy Wallace, forcibly removed a pocketbook containing $680 from the pocket of Alex Derreck, and that the defendant, Rossignol, being ready at hand, took the pocketbook, ran with it more than a city block, and only gave it up in the apparent hope that, by so doing, he might avoid capture; that is to say, there was evidence from which the jury could reasonably find larceny by a principal and an aiding and abetting thereof by the defendant on trial.

■ We come now to the question of variance. The charging part of the information, as to the principal, began as follows: "That the said defendant, John Doe, whose true name is to the Prosecuting Attorney unknown, etc."

When the proprietor of the Fountain was called as a witness, he testified that, at the time of the incident, he recognized the man who took the purse from the waiter's pocket as one who had been around the place once or twice about a year before, and was then called Danny Wallace or Eddy Wallace. It was further shown that this information had been transmitted to the office of the prosecuting attorney before the information was drawn and filed. When these matters had been made to appear, the defendant claimed that there was a fatal variance between the information and the proof, and moved for a continuance, claiming surprise. A continuance was refused, and this is assigned as legal error. It is further urged that, in any event, there is a material variance between the information and the proof, in that it is said that the information alleges that the principal was John Doe, while the proof is that the principal was Danny Wallace or Eddy Wallace.

If we understand appellant aright, he maintains that there was as great a variance here between the information and the evidence as if the information had alleged that the principal was John Jones and the evidence showed that he was in fact John Brown, or some other entirely different individual. That is not the case here. All lawyers, and indeed all well-informed laymen, know that the name John Doe is used, and for some centuries has been used, as a fictitious name to designate a party until his real name can be ascertained. Nothing can be clearer than that the proof here all points to the very same person, whether he be called John Doe or Danny Wallace or Eddy Wallace.

■ Furthermore, neither in the frequent colloquies between the court and the defendant's counsel during the trial nor in counsel's brief nor in his oral argument here, has there been the remotest suggestion as to what way, if any, his client may have been surprised or prejudiced by the court's

failure to grant a continuance, or how or in what way he could have been prejudiced by the alleged variance. Nor can we imagine any way in which he could have been prejudiced on that account. We find a single case cited in appellant's brief, *State v. Nikolich*, 137 Wash. 62, 241 Pac. 664. It is not in point. It is not even a variance case. In that case, a new trial was granted on an exception to an instruction, on the ground that it permitted the jury to find persons guilty as aiders and abettors to one who committed arson. Although there was no proof that the person charged as having been the principal (John Doe) set the fire, there was proof that Howard Carter was seen to enter the house, but Howard Carter was on trial as an aider and abettor, not as the principal. Therefore, Howard Carter could not be the person designated as John Doe. The court said, in part:

"The result is that there is no proof that the principal actor, to which the jury were required to find the appellants aiders and abettors, had anything to do with the setting of the fire."

As we have seen, there was direct proof in this case that John Doe, whose name may have been Wallace, took the purse from the pocket of Alex Derreck.

It is further contended in this case that there was another variance, in that there was proof of but one crime, that John Doe or Eddy Wallace stole a pocketbook, and, when an immediate hue and cry was raised, became frightened, threw it down, and ran from the building. It is then said:

"That was the end of the matter as far as he was concerned. He was never apprehended and never tried. Shortly thereafter the appellant found the purse (St. 72) and there his independent venture began. He started to walk out with it but immediately inside or outside handed the purse to another man who returned it to the waiter (St. 72). He was intoxicated, didn't need any money, didn't know what was in the purse. (St. 72.) This proof, of course, was quite a variance from the charge of the amended information on which he went to trial (Tr. 1), that he aided, counseled and abetted one John Doe in the taking."

The references to "(St. 72)" are to defendant's testimony only. It was the exclusive province of the jury to resolve the evidential conflicts in the case. Unfortunately for the appellant, it did not believe that his part in the chain of events was an "independent venture."

The judgment and sentence of the trial court is affirmed.

SIMPSON, C. J., BEALS, BLAKE, and MALLERY, JJ., concur.